Lina Baroudi (Cal. State Bar #269610)
LAW OFFICE OF LINA BAROUDI
2680 S. White Rd., Ste. 151
San Jose, CA 95148-2079
T: (408) 300-2655
lina@linalaw.com

Attorney for Petitioner-Plaintiff

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

|  |  |
|---|---|
| KHALID FAWZI ZAKZOUK, | No. |
|    Petitioner-Plaintiff, | |
|    v. | |
| MOISES BECERRA, Acting Field Office Director of the San Francisco Immigration and Customs Enforcement Office; | **PETITION FOR WRIT OF HABEAS CORPUS AND COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |
| TODD LYONS, Acting Director of United States Immigration and Customs Enforcement; | |
| KRISTI NOEM, Secretary of the United States Department of Homeland Security, | |
| PAM BONDI, Attorney General of the United States, | |
|    Respondents-Defendants. | |

Petition for Writ of Habeas Corpus

1

## INTRODUCTION

1.  Petitioner-Plaintiff, Khalid Fawzi Zakzouk ("Mr. Zakzouk" or "Petitioner"), by and through his undersigned counsel, hereby files this petition for writ of habeas corpus and complaint for declaratory and injunctive relief to prevent U.S. Department of Homeland Security ("DHS"), U.S. Immigration and Customs Enforcement (ICE) from returning him to an immigration jail unless, and until, his removal is reasonably foreseeable, and without first providing him a due process hearing where the government bears the burden to demonstrate to a neutral adjudicator that he is a danger to the community or a flight risk by clear and convincing evidence.

2.  On information and belief, Mr. Zakzouk has never been ordered removed to any third country or notified of such potential removal. Given the Supreme Court of the United States' decision on June 23, 2025, in *U.S. Department of Homeland Security, et al. v. D.V.D., et al.*, No. 24A1153, 2025 WL 1732103 (June 23, 2025), which stayed the nationwide injunction that had precluded Respondents-Defendants from removing noncitizens to third countries without notice and an opportunity to seek fear-based relief, ICE appears emboldened and intent to implement its campaign to send noncitizens to far corners of the planet—places they have absolutely no connection to whatsoever—in violation of clear statutory obligations set forth in the Nationality Act ("INA"), binding treaty, and due process. In the absence of the nation-wide injunction, individual lawsuits like the instant case are the only method to challenge the illegal third-country removals.

3.  Mr. Zakzouk is a stateless Palestinian who has lived in the United States since June 1, 1988. On January 24, 2000, he was ordered removed by an immigration judge, presumably to

Saudi Arabia, his country of birth and last habitual residence.[1] Although born in Saudi Arabia, Mr. Zakzouk has never been afforded citizenship in that country and has no right to return there. After he was ordered removed, ICE in Milwaukee, Wisconsin, his previous place of residence – detained Mr. Zakzouk for about three months. Presumably because he could not be removed to any country, ICE released Mr. Zakzouk on his own recognizance and placed him on an Order of Supervision ("OSUP"). After obtaining permission from ICE, Mr. Zakzouk moved to San Francisco. He was detained by the ICE San Francisco Office for three months; upon release, ICE confirmed to Mr. Zakzouk that as a stateless Palestinian with no right to return to any country, his removal was not reasonably foreseeable.

4.   Upon release on January 10, 2008, Mr. Zakzouk was again placed on an OSUP, which permitted him to remain free from custody because his removal was not reasonably foreseeable and he is neither a flight risk nor a danger to the community. The OSUP also required him to attend regular check in appointments at the ICE San Francisco Office, and permitted him to apply for work authorization. 8 C.F.R. § 241.5.

5.   Over the last seventeen years in which he has lived at liberty, Mr. Zakzouk has been the primary caretaker for his fifteen-year-old U.S. citizen daughter, who has been diagnosed with major depressive disorder and anxiety and relies heavily on her father to support her as an LQBTQIA+ teenager.[2] Mr. Zakzouk is also the homemaker in the family, responsible for

_____

[1] Due to the length of time that passed since his removal proceedings, Mr. Zakzouk has very few documents relating to his case. Counsel has requested a copy of his complete immigration file via the Freedom of Information Act, which normally take about 6-9 weeks to process.

[2] Lesbian, Gay, Bisexual, Transgender, Queer/Questioning, Intersex, and Asexual, with the plus sign (+) representing all other sexual orientations and gender identities not explicitly listed.

preparing all meals and managing the household, while he supports his U.S. citizen spouse's career. He has complied with the terms of his OSUP, regularly renews his employment authorization, and attends his check in appointments. He has never missed a check in appointment and has lived at the same address and community for years. For more than seventeen years, ICE has not moved to re-detain Mr. Zakzouk.

6.    On July 17, 2025, Mr. Zakzouk attended his regularly scheduled check in appointment at the ICE San Francisco Office; he was told that should return the following week to apply for travel documents to Saudi Arabia and Jordan. Upon explanation that he has no right to return to either country and that he is stateless, an ICE officer informed Mr. Zakzouk that "things are different now." He was instructed to return on Monday, July 21st, but obtained an extension until Monday July 28, 2025. Mr. Zakzouk promptly sought counsel.

7.    On July 24, 2025, Mr. Zakzouk's undersigned counsel emailed ICE San Francisco to seek clarification as to the purpose of the July 28th appointment. Counsel reminded ICE that Mr. Zakzouk is a stateless Palestinian who was released from ICE custody on OSUP because ICE was unable to remove him. She also asked for clarification as to what has changed since his release. To date, counsel has not received a response.

8.    Numerous credible reports demonstrate that, across the country, including in San Francisco and other Bay Area cities, individuals are being called in for check-ins and then arrested by ICE.[3]

_____

[3] "ICE confirms arrests made in South San Jose," NBC Bay Area (June 4, 2025), https://www.nbcbayarea.com/news/local/ice-agents-san-jose-market/3884432/ ("The Rapid Response Network, an immigrant watchdog group, said immigrants are being called for meetings at ISAP – Intensive Supervision Appearance Program – for what are usually routine appointments

9.  In recent months, ICE has engaged in highly publicized arrests of individuals who presented no flight risk or danger, often with no prior notice that anything regarding their status was amiss or problematic, whisking them away to faraway detention centers without warning.[4]

10. In light of credible reports of ICE re-incarcerating individuals at their check-ins, there is a strong likelihood that Mr. Zakzouk will be arrested and detained at this appointment, even though he poses no flight risk, presents no danger to the community, and his removal is not reasonably foreseeable. If he is arrested, he faces the very real possibility of being transferred outside of Northern California with little or no notice, far away from his spouse, his minor U.S. citizen child, his community, and his attorney.

11. The only legitimate (and constitutional) justifications for immigration detention are danger and flight risk. *See Zadvydas v. Davis*, 533 U.S. 678, 690 (2001). When immigration agents released

---

to check on their immigration status. But the immigrants who show up are taken from ISAP to a holding area behind Chavez Supermarket for processing and apparently to be taken to a detention center, the Rapid Response Network said."); "ICE arrests 15 people, including 3-year-old child, in San Francisco, advocates say," San Francisco Chronicle (June 5, 2025), https://www.sfchronicle.com/bayarea/article/ice-arrests-sf-immigration-trump-20362755.php; "Cincinnati high school graduate faces deportation after routine ICE check-in," ABC News (June 9, 2025), https://abcnews.go.com/US/cincinnati-high-school-graduate-faces-deportation-after-routine/story?id=122652262.

[4] *See, e.g.*, McKinnon de Kuyper, *Mahmoud Khalil's Lawyers Release Video of His Arrest*, N.Y. Times (Mar. 15, 2025), *available at* https://www.nytimes.com/video/us/politics/100000010054472/mahmoud-khalils-arrest.html (Mahmoud Khalil, arrested in New York and transferred to Louisiana); "What we know about the Tufts University PhD student detained by federal agents," CNN (Mar. 28, 2025), https://www.cnn.com/2025/03/27/us/rumeysa-ozturk-detained-what-we-know/index.html (Rumeysa Ozturk, arrested in Boston and transferred to Louisiana); Kyle Cheney & Josh Gerstein, *Trump is seeking to deport another academic who is legally in the country, lawsuit says*, Politico (Mar. 19, 2025), *available at* https://www.politico.com/news/2025/03/19/trump-deportationgeorgetown-graduate-student-00239754 (Badar Khan Suri, arrested in Arlington, Virginia and transferred to Texas).

Mr. Zakzouk from their custody on his own recognizance – twice –, they necessarily determined that he was neither a danger to the community nor a flight risk. *See* 8 C.F.R. § 1236(c)(8) ("Any [authorized] officer … may … release [a noncitizen] not described in section 236(c)(1) of the Act … provided that the [noncitizen] must demonstrate to the satisfaction of the officer that such release would not pose a danger to property or persons, and that the [noncitizen] is likely to appear for any future proceeding."); *see also, e.g.*, *Saravia v. Sessions*, 280 F. Supp. 3d 1168, 1176 (N.D. Cal. 2017), *aff'd sub nom. Saravia for A.H. v. Sessions*, 905 F.3d 1137 (9th Cir. 2018) ("Release reflects a determination by the government that the noncitizen is not a danger to the community or a flight risk."). But nothing about Mr. Zakzouk's circumstances changed between the government's initial determination seventeen years ago and his ICE check in this month to justify re-detention. On the contrary, Mr. Zakzouk's conduct in the past seventeen years – his full compliance with supervision requirements, his appearance at all of his ICE check in appointments, his commitment to his spouse and minor daughter, and his community ties – only further confirm the government's conclusion that he is not a danger or flight risk. This basic principle—that individuals placed at liberty are entitled to process before the government imprisons them—has particular force here, where Mr. Zakzouk's detention was *already* found to be unnecessary to serve its purpose. ICE previously found that he need not be incarcerated to prevent flight or to protect the community, and no circumstances have changed that would justify re-arrest.

12. Therefore, at a minimum, in order to lawfully re-arrest Mr. Zakzouk, the government must first establish, by clear and convincing evidence and before a neutral decision maker, that he is a danger to the community or a flight risk, such that his re-incarceration is necessary.

13. By statute and regulation, ICE has the authority to re-detain a noncitizen on an OSUP previously ordered removed only in specific circumstances, including where an individual violates any condition of release or the individual's conduct demonstrates that release is no longer

appropriate. 8 U.S.C. § 1231; 8 C.F.R. § 241.4(l)(1)-(2). That authority, however, is proscribed by the Due Process Clause because it is well-established that individuals released from incarceration have a liberty interest in their freedom. In turn, to protect that interest, on the particular facts of Mr. Zakzouk's case, due process requires notice and a hearing, prior to any re-detention, at which he was afforded the opportunity to advance his arguments as to why he should not be re-detained.

14. Here, Respondents-Defendants created a reasonable expectation that Mr. Zakzouk would be permitted to live and work in the United States without being subject to arbitrary arrest and removal.

15. This reasonable expectation creates constitutionally-protected liberty and property interests. *Perry v. Sindermann*, 408 U.S. 593, 601–03 (1972) (reliance on policies and practices may establish a legitimate claim of entitlement to a constitutionally-protected interest); *see also Texas v. United States*, 809 F.3d 134, 174 (2015), affirmed by an equally divided court, 136 S. Ct. 2271 (2016) (explaining that "DACA involve[s] issuing benefits" to certain applicants). These benefits are entitled to constitutional protections no matter how they may be characterized by Respondents-Defendants. *See, e.g., Newman v. Sathyavaglswaran*, 287 F.3d 786, 797 (9th Cir. 2002) ("[T]he identification of property interests under constitutional law turns on the substance of the interest recognized, not the name given that interest by the state or other independent source.") (internal quotations omitted).

16. Further, the Supreme Court has limited the potentially indefinite post-removal order detention to a maximum of six months, because removal is not reasonably foreseeable. *Zadvydas v. Davis*, 533 U.S. 678, 701 (2001). Because Mr. Zakzouk is stateless, and ICE has already been unsuccessful in removing him from the United States (both in Milwaukee and San Francisco), he

1    should not be re-detained unless and until DHS proves to an immigration judge that given his

2    detention has the potential to be unconstitutionally indefinite, that his removal from the U.S. is

3    actually reasonably foreseeable. Several federal district courts have already ordered similar

4    relief. *See* Declaration of Lina Baroudi ("LB Decl.") at Exhibit ("Exh.") D (Order in *Hoac v.*

5    *Becerra, et al,* 2:25-cv-01740-DC-JDP (E.D. Cal. July 16, 2025), Exh. E (Order in *Phan v.*

6    *Becerra, et al,* 2:25-cv-01757 (E.D. Cal. July 16, 2025). During any custody redetermination

7    hearing that occurs, the Immigration Judge must further consider whether, in lieu of detention,

8    alternatives to detention exist to mitigate any risk that DHS may establish.  Any re-detention

9    without any reasonably foreseeable end point will be unconstitutionally prolonged in violation of

10   clear Supreme Court precedent.

11       17. Moreover, under the INA, Respondents-Defendants have a statutory obligation to remove

12   Mr. Zakzouk only to the designated country of removal – in this case, Saudi Arabia. 8 U.S.C. §

13   1231(b)(2)(A)(ii). If Mr. Zakzouk is to be removed to a third country, Respondents-Defendants

14   must first assert a basis under 8 U.S.C. § 1231(b)(2)(C) and ICE must provide him with

15   sufficient notice and an opportunity to respond and apply for fear-based relief as to that country,

16   in compliance with the INA, due process, and the binding international treaty: The Convention

17   Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment. Currently,

18   DHS has a policy of removing or seeking to remove individuals to third countries without first

19   providing constitutionally adequate notice of third country removal, or any meaningful

20   opportunity to contest that removal if the individual has a fear of persecution or torture in that

21   country. *See* LB Decl. at Exh. A (DHS Policy Regarding Third Country Removal). The U.S.

22   District Court for the District of Massachusetts previously issued a nationwide preliminary

23   injunction blocking such third country removals without notice and a meaningful opportunity to

apply for relief under the Convention Against Torture, in recognition that the government's policy violates due process and the United States' obligations under the Convention Against Torture. *D.V.D., et al. v. U.S. Department of Homeland Security, et al.*, No. 25-10676-BEM (D. Mass. Apr. 18, 2025). The U.S. Supreme Court has since granted the government's motion to stay the injunction on June 23, 2025, just before the Court published *Trump v. Casa*, No. 24A884 (June 27, 2025) limiting nationwide injunctions. Thus, the Supreme Court's order, which is not accompanied by an opinion, signals only disagreement with the nature, and not the substance, of the nationwide preliminary foreseeable. Several federal district courts have already ordered similar relief.

## CUSTODY

18. Mr. Zakzouk is currently released from custody on his own recognizance as directed by ICE San Francisco. He is also on an Order of Supervision, which subjects him to ICE check-ins like the appointment scheduled on Monday, July 28, 2025. Such stringent requirements "impose[] conditions which significantly confine and restrain his freedom; this is enough to keep him in the 'custody' of [the DHS] within the meaning of the habeas corpus statute." *Jones v. Cunningham*, 371 U.S. 236, 243 (1963). *See also Rodriguez v. Hayes*, 591 F.3d 1105, 1118 (9th Cir. 2009) (holding that comparable supervision requirements constitute "custody" sufficient to support habeas jurisdiction).

## JURISDICTION

19. The Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 (federal question), 28 U.S.C. § 1651 (All Writs Act), 28 U.S.C. §§ 2201–02 (Declaratory Judgment Act), 28 U.S.C. § 2241 (habeas corpus), Article I, § 9, cl. 2 of the U.S. Constitution (the Suspension Clause), the Fourth and Fifth Amendments to the U.S. Constitution, 5 U.S.C. §§ 701-706 (Administrative Procedure Act), and the common law.

## REQUIREMENTS OF 28 U.S.C. § 2243

20. The Court must grant the petition for writ of habeas corpus or issue an order to show cause ("OSC") to Respondents-Defendants "forthwith," unless the petitioner is not entitled to relief. 28 U.S.C. § 2243. If an OSC is issued, the Court must require Respondents-Defendants to file a return "within *three* days unless for good cause additional time, not exceeding twenty days, is allowed." *Id*. (emphasis added).

21. Courts have long recognized the significance of the habeas statute in protecting individuals from unlawful detention. The Great Writ has been referred to as "perhaps the most important writ known to the constitutional law of England, affording as it does a swift and imperative remedy in all cases of illegal restraint or confinement." *Fay v. Noia*, 372 U.S. 391, 400 (1963) (emphasis added).

22. Habeas corpus must remain a swift remedy. Importantly, "the statute itself directs courts to give petitions for habeas corpus 'special, preferential consideration to insure expeditious hearing and determination.'" *Yong v. INS*, 208 F.3d 1116, 1120 (9th Cir. 2000) (internal citations omitted). The Ninth Circuit warned against any action creating the perception "that courts are more concerned with efficient trial management than with the vindication of constitutional rights." *Id*.

## VENUE

23. Venue is properly before this Court pursuant to 28 U.S.C. § 1391(e) because the Respondents-Defendants are employees or officers of the United States, acting in their official capacity; because a substantial part of the events or omissions giving rise to the claim occurred in the Northern District of California; because Mr. Zakzouk is under the jurisdiction of the ICE

San Francisco Office, which is in the jurisdiction of the Northern District of California; and because there is no real property involved in this action.

## INTRADISTRICT ASSIGNMENT

24. Any decision to re-arrest and re-incarcerate Mr. Zakzouk will be made by the ICE San Francisco Office. Therefore, the assignment to the San Francisco Division of this Court is proper under N.D. Local Rule 3-2(d).

## EXHAUSTION

25. For habeas claims, exhaustion of administrative remedies is prudential, not jurisdictional. *Hernandez v. Sessions*, 872 F.3d 976, 988 (9th Cir. 2017). A court may waive the prudential exhaustion requirement if "administrative remedies are inadequate or not efficacious, pursuit of administrative remedies would be a futile gesture, irreparable injury will result, or the administrative proceedings would be void." *Id.* (quoting *Laing v. Ashcroft*, 370 F.3d 994, 1000 (9th Cir. 2004) (citation and quotation marks omitted)). Petitioner-Plaintiff asserts that exhaustion is satisfied as there is no administrative jurisdiction over this detention status because he already has a final order of removal.

26. No statutory exhaustion requirements apply to Petitioner-Plaintiff's claim of unlawful custody in violation of his due process rights, and there are no administrative remedies that he needs to exhaust. *See Am.-Arab Anti-Discrimination Comm. v. Reno*, 70 F.3d 1045, 1058 (9th Cir. 1995) (finding exhaustion to be a "futile exercise because the agency does not have jurisdiction to review" constitutional claims); *In re Indefinite Det. Cases*, 82 F. Supp. 2d 1098, 1099 (C.D. Cal. 2000) (same).

**PARTIES**

27. Petitioner-Plaintiff, Khalid Fawzi Zakzouk, is a stateless Palestinian who has lived in the United States since June 1, 1988. On January 24, 2000, he was ordered removed by an Immigration Judge to Saudi Arabia, his country of birth and last habitual residence. Although born in Saudi Arabia, Mr. Zakzouk has never been afforded citizenship in that country and has no right to return there. After he was ordered removed, ICE was unsuccessful in its attempts to remove him from the U.S. and released on an Order of Supervisor. Seventeen years later, ICE has informed Mr. Zakzouk that "things are different now." In light of credible reports of ICE re-incarcerating individuals at their check-ins, there is a strong likelihood that Mr. Zakzouk will be arrested and detained at this appointment, even though he poses no flight risk, presents no danger to the community, and his removal is not reasonably foreseeable.

28. Respondent-Defendant Moises Becerra is the Acting Field Office Director of ICE in San Francisco, California and is named in his official capacity. ICE is the component of the DHS that is responsible for detaining and removing noncitizens according to immigration law and oversees custody determinations. In his official capacity, he is the legal custodian of Mr. Zakzouk.

29. Respondent-Defendant Todd M. Lyons is the Acting Director of ICE and is named in his official capacity. As the Senior Official Performing the Duties of the Director of ICE, he is responsible for the administration and enforcement of the immigration laws of the United States, including the removal of noncitizens. In his official capacity, he is the legal custodian of Mr. Zakzouk.

30. Respondent-Defendant Kristi Noem is the Secretary of the DHS and is named in her official capacity. DHS is the federal agency encompassing ICE, which is responsible for the administration and enforcement of the INA and all other laws relating to the immigration of

noncitizens. In her capacity as Secretary, **Respondent-Defendant** Noem has responsibility for the administration and enforcement of the immigration and naturalization laws pursuant to section 402 of the Homeland Security Act of 2002, 107 Pub. L. No. 296, 116 Stat. 2135 (Nov. 25, 2002); *see also* 8 U.S.C. § 1103(a). In that capacity and through her agents, **Respondent-Defendant** Noem has broad authority over and responsibility for the operation and enforcement of the immigration laws and is legally responsible for pursuing any effort to detain and remove Mr. Zakzouk. Respondent-Defendant Noem is sued in her official capacity.

31. Respondent-Defendant Pam Bondi is the Attorney General of the United States and the most senior official at the Department of Justice and is named in her official capacity. In that capacity and through her agents, she is responsible for overseeing the implementation and enforcement of the federal immigration laws. The Attorney General delegates this responsibility to the Executive Office for Immigration Review, which administers the immigration courts and the BIA.

## **STATEMENT OF FACTS**

32. Mr. Zakzouk entered the United States on an F-1 student visa on June 1, 1988, using an Egyptian Refugee Travel Document. On March 31, 1998, he filed an application for asylum with the former Immigration and Naturalization Service ("INS"), in which he sought protection from his country of birth and country of last habitual residence, Saudi Arabia.[5] 8 U.S.C. §

---

[5] The Immigration and Naturalization Service (INS) was dissolved in March 2003 pursuant to the Homeland Security Act of 2002, Pub. L. No. 107-296, 116 Stat. 2135. Its functions were transferred to the newly created Department of Homeland Security (DHS), with immigration-related responsibilities divided primarily among U.S. Citizenship and Immigration Services

1101(a)(42)(A); 8 C.F.R. § 1208.13(b)(2)(ii). Despite his birth there, Mr. Zakzouk is not a citizen of Saudi Arabia because Saudi Arabia's citizenship law is based on a strict interpretation of *jus sanguinis* (right of blood). Mr. Zakzouk has never been accorded citizenship by any country, nor is he eligible for a passport from the Palestinian Authority (PA).

33. Since Saudi Arabia is not a signatory to the 1951 Refugee Convention, it does not issue refugee travel documents to Palestinians. Instead, it is common for Palestinians in Saudi Arabia to apply for an Egyptian refugee travel document at the Egyptian embassy, even though Egypt does not offer citizenship to Palestinians.

34. The Chicago Asylum Office declined to grant Mr. Zakzouk's case, and he was referred to the Chicago Immigration Court for removal proceedings. On January 24, 2000, an immigration case denied Mr. Zakzouk's applications for relief and ordered him removed. Although Mr. Zakzouk filed a motion to reopen, that was also denied by the immigration judge on February 18, 2003.

35. At some point, Mr. Zakzouk was imprisoned for a pending criminal charge for about three months. Upon his release, ICE in Milwaukee – his previous place of residence – detained Mr. Zakzouk for about three months. Presumably because he could not be removed to any country, ICE released Mr. Zakzouk on his own recognizance and placed him on an OSUP. After obtaining permission from ICE, Mr. Zakzouk moved to San Francisco. He was detained by the ICE San Francisco Office for three months; upon release, ICE confirmed to Mr. Zakzouk that as

---

(USCIS), Immigration and Customs Enforcement (ICE), and Customs and Border Protection (CBP).

a stateless Palestinian with no right to return to any country, his removal was not reasonably foreseeable.

36. Upon release on January 10, 2008, Mr. Zakzouk was again placed on an OSUP, which permitted him to remain free from custody because his removal was not reasonably foreseeable and he is neither a flight risk nor a danger to the community. The OSUP also required him to attend regular check in appointments at the ICE San Francisco Office, and permitted him to apply for work authorization. 8 C.F.R. § 241.5.

37. Over the last seventeen years in which he has lived at liberty, Mr. Zakzouk has been the primary caretaker for his fifteen-year-old U.S. citizen daughter, who has been diagnosed with major depressive disorder and anxiety and relies heavily on her father to support her as an LQBTQIA+ teenager. Mr. Zakzouk is also the homemaker in the family, responsible for preparing all meals and managing the household, while he supports his U.S. citizen spouse's career. He has complied with the terms of his OSUP, regularly renews his employment authorization, and attends his check in appointments. He has never missed a check in appointment and has lived at the same address and community for years. For more than seventeen years, ICE has not moved to re-detain Mr. Zakzouk.

38. On July 17, 2025, Mr. Zakzouk attended his regularly scheduled check-in appointment at the ICE San Francisco Office; he was told that he should return the following week to apply for travel documents to Saudi Arabia and Jordan. Upon explanation that he has no right to return to either country and that he is stateless, an ICE officer informed Mr. Zakzouk that "things are different now." He was instructed to return on Monday, July 21st, but obtained an extension until Monday July 28, 2025. Mr. Zakzouk promptly sought counsel.

39. On July 24, 2025, Mr. Zakzouk's undersigned counsel emailed ICE San Francisco to seek

clarification as to the purpose of the July 28th appointment. Counsel reminded ICE that Mr. Zakzouk is a stateless Palestinian who was released from ICE custody on OSUP because ICE was unable to remove him. She also asked for clarification as to what has changed since his release. To date, counsel has not received a response.

40. Upon release from ICE San Francisco on January 10, 2008, Mr. Zakzouk was again placed on an OSUP, which permitted him to remain free from custody following his removal order because his removal was not reasonably foreseeable and he is neither a flight risk nor a danger to the community. The OSUP also required him to attend regular check in appointments at the ICE San Francisco Office, and permitted him to apply for work authorization. 8 C.F.R. § 241.5.

41. Over the last seventeen years in which he has lived at liberty, Mr. Zakzouk has been the primary caretaker for his minor U.S. citizen daughter, and sole support for his U.S citizen spouse. He has complied with the terms of his OSUP, regularly renewed his employment authorization, and attended his check in appointments. He has never missed a check in appointment and has lived at the same address for years. For more than seventeen years, ICE has not moved to re-detain Mr. Zakzouk.

42. In recent months, ICE has engaged in highly publicized arrests of individuals who presented no flight risk or danger, often with no prior notice that anything regarding their status was amiss or problematic, whisking them away to faraway detention centers without warning.

43. In light of credible reports of ICE re-incarcerating individuals at their check-ins, it is highly likely Mr. Zakzouk will be arrested and detained at this appointment, despite the fact that his removal is not reasonably foreseeable and he is neither a flight risk nor a danger to the community. If he is arrested, he faces the very real possibility of being transferred outside of

Northern California with little or no notice, far away from his spouse, his minor U.S. citizen child, and his community.

44. Mr. Zakzouk is also at risk of being unlawfully removed to a third country without constitutionally adequate notice and a meaningful opportunity to apply for protection under the Convention Against Torture, in violation of the INA, binding international treaty, and due process. Currently, DHS has a policy of removing or seeking to remove individuals to third countries without first providing adequate notice of third country removal, or any meaningful opportunity to contest that removal if the individual has a fear of persecution or torture in that country. *See* LB Decl. at Exh. A (DHS Policy Regarding Third Country Removal). Intervention from this Court is therefore required to ensure that Mr. Zakzouk does not suffer irreparable harm in the form of unjustified, prolonged, and indefinite re-detention, and further violation of his rights in the form of summary removal to a third country.

## LEGAL BACKGROUND

**Right to a Hearing Prior to Re-incarceration**

45. Following a final order of removal, ICE is directed by statute to detain an individual for ninety (90) days in order to effectuate removal. 8 U.S.C. § 1231(a)(2). This ninety (90) day period, also known as "the removal period," generally commences as soon as a removal order becomes administratively final. *Id*. at § 1231(a)(1)(A); § 1231(a)(1)(B).

46. If ICE fails to remove an individual during the ninety (90) day removal period, the law requires ICE to release the individual under conditions of supervision, including periodic reporting. 8 U.S.C. § 1231(a)(3) ("If the alien . . . is not removed within the removal period, the alien, pending removal, shall be subject to supervision."). Limited exceptions to this rule exist. Specifically, ICE "may" detain an individual beyond ninety days if the individual was

ordered removed on criminal grounds or is determined to pose a danger or flight risk. 8 U.S.C. § 1231(a)(6). However, ICE's authority to detain an individual beyond the removal period under such circumstances is not boundless. Rather, it is constrained by the constitutional requirement that detention "bear a reasonable relationship to the purpose for which the individual [was] committed." *Zadvydas v. Davis*, 533 U.S. 678, 690 (2001). Because the principal purpose of the post-final-order detention statute is to effectuate removal, detention bears no reasonable relation to its purpose if removal cannot be effectuated. *Id*. at 697.

47. Post-final order detention is only authorized for a "period reasonably necessary to secure removal," a period that the Court determined to be presumptively six months. *Id*. at 699-701. After this six (6) month period, if a detainee provides "good reason" to believe that his or her removal is not significantly likely in the reasonably foreseeable future, "the Government must respond with evidence sufficient to rebut that showing." *Id*. at 701. If the government cannot do so, the individual must be released.

48. That said, detainees are entitled to release even before six months of detention, as long as removal is not reasonably foreseeable. See 8 C.F.R. § 241.13(b)(1) (authorizing release after ninety days where removal not reasonably foreseeable). Moreover, as the period of post-final-order detention grows, what counts as "reasonably foreseeable" must conversely shrink. *Zadvydas* at 701.

49. Even where detention meets the *Zadvydas* standard for reasonable foreseeability, detention violates the Due Process Clause unless it is "reasonably related" to the government's purpose, which is to prevent danger or flight risk. *See Zadvydas*, 533 U.S. at 700 ("[I]f removal is reasonably foreseeable, the habeas court should consider the risk of the alien's committing further crimes as a factor potentially justifying confinement within that reasonable removal

period") (emphasis added); *Id.* at 699 (purpose of detention is "assuring the alien's presence at the moment of removal"); *Id.* at 690-91 (discussing twin justifications of detention as preventing flight and protecting the community).

50. The government's own regulations contemplate this requirement. They dictate that even after ICE determines that removal is reasonably foreseeable—and that detention therefore does not per se exceed statutory authority—the government must still determine whether continued detention is warranted based on flight risk or danger. *See* 8 C.F.R. § 241.13(g)(2) (providing that where removal is reasonably foreseeable, "detention will continue to be governed under the established standards" in 8 C.F.R. § 241.4).

51. The regulations at 8 C.F.R. § 241.4 set forth the custody review process that existed even before *Zadvydas*. This mandated process, known as the post-order custody review, requires ICE to conduct "90-day custody reviews" prior to expiration of the ninety-day removal period and to consider release of individuals who pose no danger or flight risk. 8 C.F.R. § 241.4(e)-(f). Among the factors to be considered in these custody reviews are "ties to the United States such as the number of close relatives residing here lawfully"; whether the noncitizen "is a significant flight risk"; and "any other information that is probative of whether" the noncitizen is likely to "adjust to life in a community," "engage in future acts of violence," "engage in future criminal activity," pose a danger to themselves or others, or "violate the conditions of his or her release from immigration custody pending removal from the United States." *Id*.

52. Individuals with final orders who are released after a post-order custody review are

1   subject to Forms I-220B, Order of Supervision. 8 C.F.R. § 241.4(j). After an individual has

2   been released on an order of supervision, as Mr. Zakzouk was, ICE cannot revoke such an

3   order without cause or adequate legal process. 8 C.F.R. § 241.13(i)(2)-(3).

4   **Mr. Zakzouk's Protected Liberty Interest in His Release**

5       53. Mr. Zakzouk's liberty from immigration custody is protected by the Due Process

6   Clause: "Freedom from imprisonment—from government custody, detention, or other forms of

7   physical restraint—lies at the heart of the liberty that [the Due Process] Clause protects."

8   *Zadvydas*, *supra*, 533 U.S. at 690.

9       54. For more than seventeen years, Mr. Zakzouk has exercised that freedom under his prior

10  release from ICE custody in 2008. He thus retains a weighty liberty interest under the Due

11  Process Clause of the Fifth Amendment in avoiding re-incarceration. *See Young v. Harper*, 520

12  U.S. 143, 146-47 (1997); *Gagnon v. Scarpelli*, 411 U.S. 778, 781-82 (1973); *Morrissey v.*

13  *Brewer*, 408 U.S. 471, 482-483 (1972). Moreover, the Supreme Court has recognized that post-

14  removal order detention is potentially indefinite and thus unconstitutional without some

15  limitation. *Zadvydas*, 533 U.S. at 701. In this case, in the absence of actually obtaining a travel

16  document from a country that will accept Mr. Zakzouk, his removal is not foreseeable at all, let

17  alone reasonably. Therefore, re-detention is unconstitutional.

18      55. Just as importantly, Mr. Zakzouk has continued presenting himself before ICE for his

19  regular check-in appointments for the past seventeen years, where ICE did not seek to re-arrest

20  him during this time. ICE instead gave him a future date and time to appear again.

21      56. In *Morrissey*, the Supreme Court examined the "nature of the interest" that a parolee

22  has in "his continued liberty." 408 U.S. at 481-82. The Court noted that, "subject to the

23  conditions of his parole, [a parolee] can be gainfully employed and is free to be with family

and friends and to form the other enduring attachments of normal life." *Id*. at 482. The Court further noted that "the parolee has relied on at least an implicit promise that parole will be revoked only if he fails to live up to the parole conditions." *Id*. The Court explained that "the liberty of a parolee, although indeterminate, includes many of the core values of unqualified liberty and its termination inflicts a grievous loss on the parolee and often others." *Id*. In turn, "[b]y whatever name, the liberty is valuable and must be seen within the protection of the [Fifth] Amendment." *Morrissey*, 408 U.S. at 482.

57. This basic principle—that individuals have a liberty interest in their release—has been reinforced by both the Supreme Court and the circuit courts on numerous occasions. *See*, e.g., *Young, supra*, 520 U.S. at 152 (holding that individuals placed in a pre-parole program created to reduce prison overcrowding have a protected liberty interest requiring pre-deprivation process); *Gagnon, supra*, 411 U.S. at 781-82 (holding that individuals released on felony probation have a protected liberty interest requiring pre-deprivation process). As the First Circuit has explained, when analyzing the issue of whether a specific conditional release rises to the level of a protected liberty interest, "[c]ourts have resolved the issue by comparing the specific conditional release in the case before them with the liberty interest in parole as characterized by *Morrissey*." *Gonzalez-Fuentes v. Molina*, 607 F.3d 864, 887 (1st Cir. 2010) (internal quotation marks and citation omitted). *See also, e.g., Hurd v. District of Columbia*, 864 F.3d 671, 683 (D.C. Cir. 2017) ("a person who is in fact free of physical confinement— even if that freedom is lawfully revocable—has a liberty interest that entitles him to constitutional due process before he is re-incarcerated") (citing *Young*, 520 U.S. at 152, *Gagnon*, 411 U.S. at 782, and *Morrissey*, 408 U.S. at 482).

58. In fact, it is well-established that an individual maintains a protectable liberty interest

1   even where the individual obtains liberty through a mistake of law or fact. *See id.*; *Gonzalez-*

2   *Fuentes*, 607 F.3d at 887; *Johnson v. Williford*, 682 F.2d 868, 873 (9th Cir. 1982) (noting that

3   due process considerations support the notion that an inmate released on parole by mistake,

4   because he was serving a sentence that did not carry a possibility of parole, could not be re-

5   incarcerated because the mistaken release was not his fault, and he had appropriately adjusted

6   to society, so it "would be inconsistent with fundamental principles of liberty and justice" to

7   return him to prison) (internal quotation marks and citation omitted).

8       59. Here, when this Court "'compar[es] the specific conditional release in [Mr. Zakzouk's

9   case], with the liberty interest in parole as characterized by *Morrissey*,'" it is clear that they are

10  strikingly similar. *See Gonzalez-Fuentes*, 607 F.3d at 887. Just as in *Morrissey*, Mr. Zakzouk's

11  release "enables him to do a wide range of things open to persons'" who have never been in

12  custody or convicted of any crime, including to live at home, work with his community, and

13  "be with family and friends and to form the other enduring attachments of normal life."

14  *Morrissey*, 408 U.S. at 482.

15      60. Since his release in 2008, which came after approximately 90 days in ICE custody, Mr.

16  Zakzouk has been focused on being the primary caretaker of his daughter and providing a

17  stable life for his family.

18  **Mr. Zakzouk's Liberty Interest Mandates a Due Process Hearing Before any Re-Detention**

19
20      61. Mr. Zakzouk asserts that, here, (1) where his detention is civil, (2) where he has been at

21  liberty for seventeen years, during which time he has complied with all conditions of release

22  and served as the sole caretaker for his minor U.S. citizen daughter, (3) where he has diligently

23  complied with ICE's reporting requirements on a regular basis, (4) where no change in

    circumstances exist that would justify his detention, and (5) where the only circumstance that

1    has changed is not related to Mr. Zakzouk, but is ICE's move to arrest as many people as

2    possible because of the new administration, due process mandates that he receive notice and a

3    hearing before a neutral adjudicator *prior* to any re-arrest or re-detention. Several federal

4    district courts have already ordered similar relief. *See* LB Decl. at Exh. B (Order in *Rodriguez*

5    *Diaz v. Kaiser, et al.*, 3:25-cv-05071 (N.D. Cal. June 14, 2025)), Exh. C (Order in *T.P.S. v.*

6    *Kaiser, et al.*, 3:25-cv-05428 (N.D. Cal. June 30, 2025)).

7        62. "Adequate, or due, process depends upon the nature of the interest affected. The more

8    important the interest and the greater the effect of its impairment, the greater the procedural

9    safeguards the [government] must provide to satisfy due process." *Haygood v. Younger*, 769

10   F.2d 1350, 1355-56 (9th Cir. 1985) (en banc) (citing *Morrissey*, 408 U.S. at 481-82). This

11   Court must "balance [Mr. Zakzouk's] liberty interest against the [government's] interest in the

12   efficient administration of" its immigration laws in order to determine what process he is owed

13   to ensure that ICE does not unconstitutionally deprive him of his liberty. *Id.* at 1357. Under the

14   test set forth in *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976), this Court must consider three

15   factors in conducting its balancing test: "first, the private interest that will be affected by the

16   official action; second, the risk of an erroneous deprivation of such interest through the

17   procedures used, and the probative value, if any, of additional or substitute procedural

18   safeguards; and finally the government's interest, including the function involved and the fiscal

19   and administrative burdens that the additional or substitute procedural requirements would

20   entail." *Haygood*, 769 F.2d at 1357 (citing *Mathews*, 424 U.S. at 335).

21       63. The Supreme Court "usually has held that the Constitution requires some kind of a

22   hearing *before* the State deprives a person of liberty or property." *Zinermon v. Burch*, 494 U.S.

23   113, 127 (1990) (emphasis in original). Only in a "special case" where post-deprivation

remedies are "the only remedies the State could be expected to provide" can post-deprivation process satisfy the requirements of due process. *Zinermon*, 494 U.S. at 985. Moreover, only where "one of the variables in the *Mathews* equation—the value of predeprivation safeguards—is negligible in preventing the kind of deprivation at issue" such that "the State cannot be required constitutionally to do the impossible by providing predeprivation process," can the government avoid providing pre-deprivation process. *Id.*

64. Because, in this case, the provision of a pre-deprivation hearing is both possible and valuable to preventing an erroneous deprivation of liberty, ICE is required to provide Mr. Zakzouk with notice and a hearing prior to any re-incarceration and revocation of his OSUP. See *Morrissey*, 408 U.S. at 481-82; *Haygood*, 769 F.2d at 1355-56; *Jones*, 393 F.3d at 932; *Zinermon*, 494 U.S. at 985; *see also Youngberg v. Romeo*, 457 U.S. 307, 321-24 (1982); *Lynch v. Baxley*, 744 F.2d 1452 (11th Cir. 1984) (holding that individuals awaiting involuntary civil commitment proceedings may not constitutionally be held in jail pending the determination as to whether they can ultimately be recommitted). Under *Mathews*, "the balance weighs heavily in favor of [Mr. Zakzouk's] liberty" and requires a pre-deprivation hearing before a neutral adjudicator, such as an Immigration Judge.

**Mr. Zakzouk's Private Interest in His Liberty is Profound**

65. Under *Morrissey* and its progeny, individuals conditionally released from serving criminal sentences have a liberty interest that is "valuable." *Morrissey*, 408 U.S. at 482. In addition, the principles espoused in *Hurd* and *Johnson*—that a person who is in fact free of physical confinement, even if that freedom is lawfully revocable, has a liberty interest that entitles him to constitutional due process before he is re-incarcerated – apply with even greater force to individuals like Mr. Zakzouk, who have also been released from prior ICE custody.

Even in the criminal parolee context, the courts have held that the parolee cannot be re-arrested without a due process hearing in which they can raise any claims they may have regarding why their re-incarceration would be unlawful. *See Gonzalez-Fuentes*, 607 F.3d 864 at 891-892; *Hurd*, 864 F.3d at 683. Thus, Mr. Zakzouk retains a truly weighty liberty interest even though he is under conditional release. What is at stake in this case for Mr. Zakzouk is one of the most profound individual interests recognized by our legal system: whether ICE may unilaterally nullify a prior release decision and be able to take away his physical freedom, i.e., his "constitutionally protected interest in avoiding physical restraint." *Singh v. Holder*, 638 F.3d 1196, 1203 (9th Cir. 2011) (internal quotation omitted). "Freedom from bodily restraint has always been at the core of the liberty protected by the Due Process Clause." *Foucha v. Louisiana*, 504 U.S. 71, 80 (1992). *See also Zadvydas*, 533 U.S. at 690 ("Freedom from imprisonment—from government custody, detention, or other forms of physical restraint—lies at the heart of the liberty that [the Due Process] Clause protects."); *Cooper v. Oklahoma*, 517 U.S. 348 (1996).

66. Thus, it is clear that there is a profound private interest at stake in this case, which must be weighed heavily when determining what process he is owed under the Constitution. *See Mathews*, 424 U.S. at 334-35.

**The Government's Interest in Re-Incarcerating Mr. Zakzouk Without a Hearing is Low and the Burden on the Government to Refrain from Re-Arresting Him Unless and Until He is Provided a Hearing That Comports with Due Process is Minimal**

67. The government's interest in detaining Mr. Zakzouk without a due process hearing is low, and when weighed against Mr. Zakzouk's significant private interest in his liberty, the scale tips sharply in favor of enjoining Respondents-Defendants from re-arresting Mr. Zakzouk unless and until the government demonstrates by clear and convincing evidence that he is a flight risk or

danger to the community, and that his removal is reasonably forseeable. It becomes abundantly clear that the *Mathews* test favors Mr. Zakzouk when the Court considers that the process he seeks—notice and a hearing regarding whether his release should be revoked and, if so, whether a bond amount should be set—is a standard course of action for the government. Providing Mr. Zakzouk with a hearing before this Court (or a neutral decisionmaker) to determine whether there is clear and convincing evidence that Mr. Zakzouk is a flight risk or danger to the community, and whether his removal is reasonably forseeable, would impose only a *de minimis* burden on the government, because the government routinely provides this sort of hearing to individuals like Mr. Zakzouk.

68. As immigration detention is civil, it can have no punitive purpose. The government's only interests in holding an individual in immigration detention can be to prevent danger to the community or to ensure a noncitizen's appearance at immigration proceedings. *See Zadvydas*, 533 U.S. at 690. In this case, the government cannot plausibly assert that it has any basis for detaining Mr. Zakzouk in July 2025 when he has lived at liberty complying with the conditions of his release since January 2008.

69. Enjoining Mr. Zakzouk's re-arrest until ICE (1) moves for a custody re-determination before an IJ and (2) demonstrates by clear and convincing evidence that Mr. Zakzouk is a flight risk or danger to the community is far *less* costly and burdensome for the government than keeping him detained. As the Ninth Circuit noted in 2017, which remains true today, "[t]he costs to the public of immigration detention are 'staggering': $158 each day per detainee, amounting to a total daily cost of $6.5 million." *Hernandez*, 872 F.3d at 996.

**Without a Due Process Hearing Prior to Any Re-Arrest, the Risk of an Erroneous Deprivation of Liberty is High, and Process in the Form of a Constitutionally Compliant Hearing Where ICE Carries the Burden Would Decrease That Risk.**

70. Providing Mr. Zakzouk a pre-deprivation hearing would decrease the risk of him being erroneously deprived of his liberty. Before Mr. Zakzouk can be lawfully detained, he must be provided with a hearing before a neutral adjudicator at which the government is held to show that there has been sufficiently changed circumstances such that its January 2008 determination should be altered or revoked because clear and convincing evidence exists to establish that Mr. Zakzouk is a danger to the community or a flight risk, and that his removal is reasonably foreseeable.

71. Under ICE's process for custody determination – which affords Mr. Zakzouk no process whatsoever –ICE can simply re-detain him at any point if the agency desires to do so. The risk that Mr. Zakzouk will be erroneously deprived of his liberty is high if ICE is permitted to re-incarcerate him after making a unilateral decision to re-arrest him.

72. The procedure Mr. Zakzouk seeks – a hearing in front of a neutral adjudicator at which the government must prove by clear and convincing evidence that circumstances have changed to justify his detention *before* any re-arrest — is much more likely to produce accurate determinations regarding factual disputes, such as whether a certain occurrence constitutes a "changed circumstance." *See Chalkboard, Inc. v. Brandt*, 902 F.2d 1375, 1381 (9th Cir. 1989) (when "delicate judgments depending on credibility of witnesses and assessment of conditions not subject to measurement" are at issue, the "risk of error is considerable when just determinations are made after hearing only one side"). "A neutral judge is one of the most basic due process protections." *Castro-Cortez v. INS*, 239 F.3d 1037, 1049 (9th Cir. 2001), *abrogated on other grounds by Fernandez-Vargas v. Gonzales*, 548 U.S. 30 (2006). The Ninth Circuit has noted that the risk of an erroneous deprivation of liberty under *Mathews* can be decreased where

1  a neutral decisionmaker, rather than ICE alone, makes custody determinations. *Diouf v.*

2  *Napolitano* ("*Diouf II*"), 634 F.3d 1081, 1091-92 (9th Cir. 2011).

3       73. Due process also requires consideration of alternatives to detention at any custody

4  redetermination hearing that may occur. The primary purpose of immigration detention is to

5  ensure a noncitizen's appearance during removal proceedings. *Zadvydas*, 533 U.S. at 697.

6  Detention is not reasonably related to this purpose if there are alternatives to detention that could

7  mitigate risk of flight. *See Bell v. Wolfish*, 441 U.S. 520, 538 (1979). Accordingly, alternatives to

8  detention must be considered in determining whether Mr. Zakzouk's re-incarceration is warranted.

9  **Right to Constitutionally Adequate Procedures Prior to Third Country Removal**

10      74. Under the INA, Respondents-Defendants have a clear and non-discretionary duty to

11  execute final orders of removal only to the designated country of removal. The statute

12  explicitly states that a noncitizen "shall remove the [noncitizen] to the country the

13  [noncitizen] . . . designates." 8 U.S.C. § 1231(b)(2)(A)(ii). And even where a noncitizen does

14  not designate the country of removal, the statute further mandates that DHS "shall remove the

15  alien to a country of which the alien is a subject, national, or citizen. *See id.*; 8 U.S.C. §

16  1231(b)(2)(D); *see also generally Jama v. ICE*, 543 U.S. 335, 341 (2005).

17      75. As the Supreme Court has explained, such language "generally indicates a command

18  that admits of no discretion on the part of the person instructed to carry out the directive," *Nat'l*

19  *Ass'n of Home Builders v. Defenders of Wildlife*, 551 U.S. 644, 661 (2007) (quoting *Ass'n of*

20  *Civilian Technicians v. Fed. Labor Relations Auth.*, 22 F.3d 1150, 1153 (D.C. Cir. 1994)); *see*

21  *also Black's Law Dictionary* (11th ed. 2019) ("Shall" means "[h]as a duty to; more broadly, is

22  required to . . . . This is the mandatory sense that drafters typically intend and that courts

23  typically uphold."); *United States v. Monsanto*, 491 U.S. 600, 607 (1989) (finding that "shall"

language in a statute was unambiguously mandatory). Accordingly, any imminent third country removal fails to comport with the statutory obligations set forth by Congress in the INA and is unlawful.

76. Moreover, prior to any third country removal, ICE must provide Mr. Zakzouk with sufficient notice and an opportunity to respond and apply for fear-based relief as to that country, in compliance with the INA, due process, and the binding international treaty: The Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment. Currently, DHS has a policy of removing or seeking to remove individuals to third countries without first providing constitutionally adequate notice of third country removal, or any meaningful opportunity to contest that removal if the individual has a fear of persecution or torture in that country. LB Decl. at Exh. A (DHS Policy Regarding Third Country Removal). This policy clearly violates due process and the United States' obligations under the Convention Against Torture.

77. The U.S. District Court for the District of Massachusetts previously issued a nationwide preliminary injunction blocking such third country removals without notice and a meaningful opportunity to apply for relief under the Convention Against Torture, in recognition that the government's policy violates due process and the United States' obligations under the Convention Against Torture. *D.V.D., et al. v. U.S. Department of Homeland Security, et al.*, No. 25-10676-BEM (D. Mass. Apr. 18, 2025). The U.S. Supreme Court has since granted the government's motion to stay the injunction on June 23, 2025, just before the Court published *Trump v. Casa*, No. 24A884 (June 27, 2025) limiting nationwide injunctions. Thus, the Supreme Court's order, which is not accompanied by an opinion, signals only disagreement with nature, and not the substance, of the nationwide preliminary injunction.

78. Thus, it is clear that if Mr. Zakzouk were to be removed to any third country it would violate his due process rights unless he is first provided with constitutionally adequate notice and a meaningful opportunity to apply for protection under the Convention Against Torture. In the absence of any other injunction, intervention by this Court is necessary to protect those rights.

**FIRST CAUSE OF ACTION**
**Violation of the Fifth Amendment to the United States Constitution**
**(Procedural Due Process—Re-Detention)**

79. Mr. Zakzouk re-alleges and incorporates herein by reference, as is set forth fully herein, the allegations in all the preceding paragraphs.

80. The Due Process Clause of the Fifth Amendment forbids the government from depriving any "person" of liberty "without due process of law." U.S. Const. amend. V.

81. Mr. Zakzouk was previously released by Respondents-Defendants because his removal was not reasonably foreseeable and he did not pose a danger or flight risk. As long as he complies with the conditions of his release, Respondents-Defendants have authority to revoke release only if circumstances have changed. 8 C.F.R. § 241.13(i)(2); 8 C.F.R. § 1231(a)(6).

82. Mr. Zakzouk has a vested liberty interest in his conditional release. Due Process does not permit the government to strip him of that liberty without a hearing before this Court. *See Morrissey*, 408 U.S. at 487-488.

83. Other than as punishment for a crime, due process permits the government to take away liberty only "in certain special and narrow nonpunitive circumstances ... where a special justification ... outweighs the individual's constitutionally protected interest in avoiding physical restraint." *Zadvydas*, 533 U.S. 678, 690. Such special justification exists only where a restraint on liberty bears a "reasonable relation" to permissible purposes. *Jackson v. Indiana*, 406 U.S. 715,

738 (1972); *see also Foucha v. Louisiana*, 504 U.S. 71, 79 (1992). In the immigration context, those purposes are "ensuring the appearance of aliens at future immigration proceedings and preventing danger to the community." *Zadvydas*, 533 U.S. at 690 (quotations omitted).

84. Those substantive limitations on detention are closely intertwined with procedural due process protections. *Foucha*, 504 U.S. 78-80. Noncitizens have a right to adequate procedures to determine whether their detention in fact serves the purposes of ensuring their appearance or protecting the community. *Id*. at 79; *Zadvydas*, 533 U.S. 692; *Casas-Castrillon v. Dep't of Homeland Sec.*, 535 F.3d 942, 949 (9th Cir. 2008). Where laws and regulations fail to provide such procedures, the habeas court may assess whether the noncitizen's immigration detention is reasonably related to the purposes of ensuring his appearance or protecting the community, *Zadvydas*, 533 U.S. at 699, or require release.

85. The INA provides for detention during the ninety (90) day "removal period" that begins immediately after a noncitizen's order of removal becomes final. 8 U.S.C. § 1231(a)(1). After the ninety (90) day removal period, the INA and its applicable regulations provide that detaining noncitizens is generally permissible only upon notice to the noncitizen and after an individualized determination of dangerousness and flight risk. *See* 8 U.S.C. § 1231(a)(6); 8 C.F.R. § 241.4(d), (f), (h) & (k).

86. Respondents-Defendants are not permitted to detain Mr. Zakzouk on the basis of his prior order of removal and without any determination of whether circumstances have changed such that his removal is reasonably foreseeable, and a determination of his danger and flight risk, by an immigration judge. This is especially true where, as here, Mr. Zakzouk received a determination from the agency issuing his Form I-220B that permitted him to remain out of custody in the first place. 8 C.F.R. § 241.13(i)(2)-(3).

87. The Court should therefore order that, prior to any re-arrest, the government must provide him with a hearing before a neutral adjudicator. At the hearing, the neutral adjudicator would evaluate, *inter alia,* whether clear and convincing evidence demonstrates that circumstances have changed such that Mr. Zakzouk's removal is reasonably foreseeable, and a determination of his danger and flight risk, such that re-detention is warranted. During any custody redetermination hearing that occurs, this Court or, in the alternative, a neutral adjudicator must consider alternatives to detention.

**SECOND CAUSE OF ACTION**
**Violation of the Fifth Amendment to the United States Constitution**
**(Procedural Due Process - Unconstitutionally Inadequate**
**Procedures Regarding Third Country Removal)**

88. Zakzouk re-alleges and incorporates herein by reference, as if set forth fully herein, the allegations in all the preceding paragraphs.

89. The Due Process Clause of the Fifth Amendment requires sufficient notice and an opportunity to be heard prior to the deprivation of any protected rights. U.S. Const. amend. V; *see also Louisiana Pacific Corp. v. Beazer Materials & Services, Inc*., 842 F.Supp. 1243, 1252 (E.D. Cal. 1994) ("[D]ue process requires that government action falling within the clause's mandate may only be taken where there is notice and an opportunity for hearing.").

90. Mr. Zakzouk has a protected interest in his life. Thus, prior to any third country removal, Mr. Zakzouk must be provided with constitutionally-compliant notice and an opportunity to respond and contest that removal if he has a fear of persecution or torture in that country.

91. For these reasons, Mr. Zakzouk removal to any third country without adequate notice and an opportunity to apply for relief under the Convention Against Torture would violate his due process rights. The only remedy of this violation is for this Court to order that he not be summarily removed to any third country unless and until he is provided constitutionally adequate procedures.

## SECOND CAUSE OF ACTION
### Violation of the INA
### (Re-Detention)

92. Mr. Zakzouk re-alleges and incorporates herein by reference, as is set forth fully herein, the allegations in all the preceding paragraphs.

93. The INA provides for detention during the ninety (90) day "removal period" that begins immediately after a noncitizen's order of removal becomes final. 8 U.S.C. § 1231(a)(1). After the ninety (90) day removal period, the INA and its applicable regulations provide that detaining noncitizens is generally permissible only upon notice to the noncitizen and after an individualized determination of dangerousness and flight risk. *See* 8 U.S.C. § 1231(a)(6); 8 C.F.R. § 241.4(d), (f), (h) & (k).

94. Respondent-Defendants are not permitted to detain Mr. Zakzouk on the basis of his prior order of removal and without any determination of whether circumstances have changed such that his removal is reasonably foreseeable, and a determination of his danger and flight risk, by an Immigration Judge. This is especially true where, as here, Mr. Zakzouk received a determination from the agency issuing his Form I-220B that permitted him to remain out of custody in the first place. 8 C.F.R. § 241.13(i)(2)-(3).

95. The Court should therefore order that, prior to any re-arrest, the government must provide him with a hearing before a neutral adjudicator. At the hearing, the neutral adjudicator would evaluate, *inter alia,* whether clear and convincing evidence demonstrates that circumstances have changed such that Mr. Zakzouk's removal is reasonably foreseeable, and a determination of his danger and flight risk, such that re-detention is warranted. During any custody redetermination hearing that occurs, this Court or, in the alternative, a neutral adjudicator must consider alternatives to detention.

**PRAYER FOR RELIEF**

WHEREFORE, Mr. Zakzouk prays that this Court grant the following relief:

(1) Assume jurisdiction over this matter;

(2) Enjoin ICE from re-arresting Mr. Zakzouk unless and until a hearing can be held before a neutral adjudicator to determine whether his re-incarceration would be lawful because the government has shown that his removal is reasonably foreseeable, and that he is a danger or a flight risk by clear and convincing evidence;

(3) Declare that Mr. Zakzouk cannot be re-arrested unless and until he is afforded a hearing on the question of whether his re-incarceration would be lawful— i.e., whether the government has demonstrated to a neutral adjudicator that he is a danger or a flight risk by clear and convincing evidence;

(4) Order that, prior to any future re-detention, Mr. Zakzouk is provided a hearing before an immigration judge where the government bears the burden of justifying Mr. Zakzouk re-detention, and that the immigration judge must further consider whether, in lieu of detention, alternatives to detention exist to mitigate any risk that DHS may establish;

(5) Order that Mr. Zakzouk cannot be removed to any third country without first being provided constitutionally-compliant procedures, including:

    a. Written notice to Mr. Zakzouk and counsel of the third country to which he may be removed, in a language that Mr. Zakzouk can understand, provided at least 21 days before any such removal;

b. A meaningful opportunity for Mr. Zakzouk to raise a fear of return for eligibility for protection under the Convention Against Torture, including a reasonable fear interview before a DHS officer;

c. If Mr. Zakzouk demonstrates a reasonable fear during the interview, DHS must move to reopen his underlying removal proceedings so that he may apply for relief under the Convention Against Torture;

d. If it is found that Mr. Zakzouk does not demonstrate a reasonable fear during the interview, a meaningful opportunity, and a minimum of 15 days, for Mr. Zakzouk to seek to move to reopen his underlying removal proceedings to challenge potential third-country removal;

(6) Award reasonable costs and attorney fees; and

(7) Grant such further relief as the Court deems just and proper.

Dated: July 25, 2025

Respectfully submitted,

*/s/ Lina Baroudi*

_____
Lina Baroudi
LAW OFFICE OF LINA BAROUDI
2680 S. White Rd., Ste. 151
San Jose, CA 95148-2079
T: (408) 300-2655
lina@linalaw.com

Attorney for Petitioner-Plaintiff

Petition for Writ of Habeas Corpus

35

**VERIFICATION PURSUANT TO 28 U.S.C. 2242**

I am submitting this verification on behalf of the Petitioner-Plaintiff because I am the Petitioner-Plaintiff's attorney. I have discussed with the Petitioner-Plaintiff the events described in the Petition. Based on those discussions, I hereby verify that the factual statements made in the attached Petition for Writ of Habeas Corpus are true and correct to the best of my knowledge.

Executed on July 25, 2025, in San José, California.


*/s/ Lina Baroudi*

_____

Lina Baroudi
Attorney for Petitioner-Plaintiff