UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| KHALID FAWZI ZAKZOUK,<br>Petitioner-Plaintiff,<br>v.<br>MOISES BECERRA, et al.,<br>Respondents-Defendants. | Case No. 25-cv-06254-KAW<br><br>**ORDER GRANTING PETITIONER'S MOTION FOR A PRELIMINARY INJUNCTION**<br>Re: Dkt. No. 2 |

On July 25, 2025, Petitioner-Plaintiff Khalid Fawzi Zakzouk filed a petition for a writ of habeas corpus and complaint for declaratory and injunctive relief. (Petition, Dkt. No. 1.) On July 26, 2025, Petitioner filed a motion for a temporary restraining order and preliminary injunction, seeking to enjoin Defendant-Respondents ("Government") from re-detaining him until he has an opportunity to challenge his re-detention before a neutral decisionmaker and there was a reasonable likelihood of removal. (Pet'r's Mot. at 31, Dkt. No. 2.) Petitioner also sought to require the Government to provide a constitutionally compliant procedure before removing Petitioner to a third country. (*Id.*) That same day, the duty judge granted Petitioner's motion for a temporary restraining order. (TRO Order, Dkt. No. 3.)

Now pending before the Court is Petitioner's motion for a preliminary injunction, as confirmed at the hearing. Having considered the parties' filings, the relevant legal authorities, and the arguments made at the October 2, 2025 hearing, the Court GRANTS Petitioner's motion for a preliminary injunction.

## I.   BACKGROUND

Petitioner is a stateless Palestinian who has resided in the United States since June 1, 1988, when he entered the country on an F-1 student visa, using an Egyptian Refugee Travel Document.

(Petition ¶¶ 3, 32.)  On March 31, 1998, he filed an application for asylum, seeking protection from his country of birth and last place of residence, Saudi Arabia.  (Petition ¶ 32.)  Although born in Saudi Arabia, Petitioner is not a citizen because Saudi Arabia's citizenship law is based on a strict interpretation of *jus sanguinis* (right of blood).  (Petition ¶ 32.)  Petitioner has never been accorded citizenship by any country, and he is not eligible for a passport from the Palestinian Authority.[1]  (Petition ¶ 32.)

On January 24, 2000, an immigration judge denied Petitioner's asylum application, ordering him removed to Saudi Arabia or, alternatively, Egypt.  (Petition ¶ 34; Alvarez Decl. ¶ 5, Exh. 1, Dkt. No. 14-1.)  On February 18, 2003, Petitioner's motion to reopen immigration proceedings was denied.  (Petition ¶ 34; Alvarez Decl. ¶ 6.)

In the interim, Petitioner was convicted of possession of drug paraphernalia in 1994, possession of tetrahydrocannabinols in 1997, receiving stolen property in 2001, and possession of a firearm in 2003.  (Alvarez Decl. ¶¶ 10, 12, 16, 17.)  At some point, Petitioner was imprisoned for a pending criminal charge; upon his release, U.S. Immigration and Customs Enforcement ("ICE") in Milwaukee (Petitioner's previous place of residence) detained Petitioner for three months.  (Petition ¶ 35.)  ICE then released Petitioner on his own recognizance and placed him on an Order of Supervision ("OSUP").  (Petition ¶ 35.)

After obtaining permission from ICE, Petitioner moved to San Francisco, where he was detained by ICE for three months.  (Petition ¶ 35.)  Upon his release on January 10, 2008, ICE confirmed that Petitioner's removal was not reasonably foreseeable because he was a stateless Palestinian with no right to return to any country.  (Petition ¶¶ 35-36.)  Petitioner was again placed on an OSUP, which required Plaintiff to attend regular check in appointments and permitted him to apply for work authorization.  (Petition ¶ 36.)

Petitioner has remained on release for the last seventeen years, without incident.  (Petition ¶ 37.)  Petitioner is married to a U.S. citizen, and is the primary caretaker for his fifteen year-old

---

[1] Although Petitioner used an Egyptian refugee travel document, it is common for Palestinians in Saudi Arabia to apply for such travel documents even though Egypt does not offer citizenship to Palestinians.  (Petition ¶ 33.)

daughter. (Petition ¶ 37.) Petitioner's daughter is a U.S. citizen, who has been diagnosed with major depressive disorder and anxiety and relies heavily on her father for support. (Petition ¶ 37.) Petitioner is a homemaker, responsible for managing the household and preparing all meals, while supporting his spouse's career. (Petition ¶ 37.) Petitioner has complied with all terms of his OSUP, including regularly renewing his employment authorization and never missing a check in appointment. (Petition ¶ 37.) During this time, ICE has never moved to re-detain Petitioner. (Petition ¶ 37.)

On Thursday, July 17, 2025, Petitioner attended his regularly scheduled check-in appointment, and was told that he should return the following week to apply for travel documents to Saudi Arabia and Jordan. (Petition ¶ 38; Alvarez Decl. ¶ 7.) Although Petitioner explained that he had no right to return to either country because he is stateless, the officer responded: "Things are different now." (Petition ¶ 38.) Petitioner was instructed to return the form on Monday, July 21, 2025, but received an extension until Monday, July 28, 2025 (Petition ¶ 38.)

On July 24, 2025, Petitioner's counsel e-mailed ICE to seek clarification for the purpose of the July 28, 2025 appointment, reiterating that Petitioner was a stateless Palestinian who was released from ICE custody on an OSUP because ICE was unable to remove him. (Petition ¶ 39.) Counsel did not receive a response. (Petition ¶ 39.) The Government now asserts that there was no intent to take Petitioner into ICE custody at the July 21, 2025 or July 28, 2025 appointments. (Alvarez Decl. ¶¶ 8-9.) The Government does not assert that it has no intent to take Petitioner into ICE custody, although the Government stated at the hearing that it could not affirmatively state that it had no intention of eventually taking Petitioner into ICE custody given the final order of removal.

On July 25, 2025, Petitioner filed the instant petition for writ of habeas corpus and complaint. On July 26, 2025, Petitioner filed a motion for a TRO and preliminary injunction; the motion for a TRO was granted that same day, enjoining the Government from "re-detaining Petitioner-Plaintiff without notice and a pre-deprivation hearing before a neutral decisionmaker." (TRO Order at 7.) On July 29, 2025, the parties stipulated to a briefing schedule and agreed that the July 26, 2025 TRO order would remain in effect pending a decision from the Court following

3

briefing and a hearing. (Dkt. No. 12.)

On August 26, 2025, the Government filed its opposition. (Gov't Opp'n, Dkt. No. 14.) On September 9, 2025, Petitioner filed his reply. (Pet'r's Reply, Dkt. No. 15.)

## II.     LEGAL STANDARD

A preliminary injunction is an "extraordinary and drastic remedy" that is "never awarded as of right." *Munaf v. Green*, 553 U.S. 674, 689-90 (2008) (citations omitted). Thus, "[a] plaintiff seeking a preliminary injunction must establish (1) likely success on the merits; (2) likely irreparable harm in the absence of preliminary relief; (3) that the balance of equities tips in the plaintiff's favor; and (4) that an injunction is in the public interest." *Pimentel v. Dreyfus*, 670 F.3d 1096, 1105 (9th Cir. 2012) (citing *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)). "[A] certain threshold showing [must be] made on each factor." *Leiva-Perez v. Holder*, 640 F.3d 962, 966 (9th Cir. 2011).

The Ninth Circuit applies a "sliding scale" approach, in which "the elements of the preliminary injunction test are balanced, so that a stronger showing of one element may offset a weaker showing of another." *Pimentel*, 670 F.3d at 1105 (internal quotation omitted). The moving party must, however, "demonstrate a fair chance of success on the merits, or questions serious enough to require litigation." *Id.* (internal quotation omitted).

## III.    DISCUSSION

### A.    Jurisdiction

As an initial matter, the Government makes various arguments that the Court lacks jurisdiction to resolve this motion. (Gov't Opp'n at 9-14.) All of these arguments were squarely rejected in *Ortega v. Kaiser*, Case No. 25-cv-5259-JST, 2025 U.S. Dist. LEXIS 152600 (N.D. Cal. Aug. 6, 2025).

First, the Government argues that Petitioner does not have a cognizable habeas petition because he "is not in physical custody and is not challenging restraints on his freedom." (Gov't Opp'n at 9.) The Supreme Court has held that "habeas corpus relief is not limited to immediate release from illegal custody, but that the writ is available as well to attack future confinement and obtain future releases." *Preiser v. Rodriguez*, 411 U.S. 475, 487 (1973). Thus, *Ortega* rejected

4

the Government's argument that habeas relief is unavailable where the petitioner is not in immediate custody. 2025 U.S. Dist. LEXIS 152600, at *6; *see also Giorges v. Kaiser*, Case No. 25-cv-7683-TLT, 2025 U.S. Dist. LEXIS 176069, at *7 (N.D. Cal. Sept. 9, 2025). Additionally, Petitioner is bringing due process claims and has pled federal question jurisdiction, which serves as an alternative basis for jurisdiction. (Petition ¶ 19; *see Ortega*, 2025 U.S. Dist. LEXIS 152600, at *6-7 ("A district court has authority both to entertain constitutional challenges and to grant injunctive relief where a plaintiff's due process claims arise under the Constitution, and a plaintiff invokes 28 U.S.C. § 1331, which provides subject matter jurisdiction irrespective of the accompanying habeas petition").)

Second, the Government argues that 8 U.S.C. § 1252(g) bars the Court's review of Petitioner's claims because it "arises from his concerns about the execution of his removal order." (Gov't Opp'n at 10.) In relevant part, § 1252(g) provides: "no court shall have any jurisdiction to hear any cause or claim by or on behalf of any alien arising from the decision or action by the Attorney General to commence proceedings, adjudicate cases, or execute removal orders against any alien under this Act." Here, Petitioner does not challenge the validity or execution of the removal order, but his potential detention or removal to a third country without constitutionally adequate notice or a meaningful opportunity to apply for protection under the Convention Against Torture ("CAT"), as required by the Immigration and Nationality Act ("INA"). (*See* Petition ¶¶ 43-44.) In *Ortega*, the district court likewise found that § 1252(g) did not apply where the petitioner was "not challeng[ing[ the execution of the final removal order entered against him, which provided for his removal *only to El Salvador*" but "his potential detention or removal to a country *other* than El Salvador." 2025 U.S. Dist. LEXIS 152600, at *7-8. In so finding, the district court emphasized that the Supreme Court has adopted a "'narrow reading of § 1252(g)' that excludes from its reach 'many other decisions or actions that may be part of the deportation process.'" *Id.* at *8 (quoting *Reno v. Am.-Arab Anti Discrim. Comm.*, 525 U.S. 471, 486 (1999)).

Third, the Government argues that 8 U.S.C. §§ 1252(a)(5) and (b)(g) requires a court of appeals to review Petitioner's claims rather than this court. (Gov't Opp'n at 12.) The Ninth Circuit, however, has made clear that these sections were "not intended to preclude habeas review

5

over challenges to detention that are independent of challenges to removal orders." *Singh v. Holder*, 638 F.3d 1196, 1211 (9th Cir. 2011) (internal quotation omitted). Again, Petitioner is not challenging the validity of his final removal order, but any potential removal to a third country without a meaningful opportunity to apply for CAT protection or his indefinite detention while the Government seeks a third-country removal order or attempts to remove Petitioner to a country to which he has no right to return. Thus, §§ 1252(a)(5) and (b)(g) do not apply. *See Ortega*, 2025 U.S. Dist. LEXIS 152600, at *10; *Singh*, 638 F.3d at 1006 (finding that § 1252(a)(5) did not bar the petitioner's claims because his claims "are independent of his removal order" and did not require the court "to review the removal order").

Finally, the Government turns to the Foreign Affairs Reform and Restructuring Act of 1998 ("FARRA"), which implements CAT and provides that "no court shall have jurisdiction to review the regulations adopted to implement this section, and nothing in this section shall be construed as providing any court jurisdiction to consider or review claims raised under the Convention or this section." (Gov't Opp'n at 13; FARRA § 2242(d), codified at 8 U.S.C. § 1231 (note).) Petitioner does not seek review of "the regulations adopted to implement" CAT or "claims considered under" CAT. Rather, "he seeks review of only his potential re-detention and *notice and opportunity* to apply for CAT relief if removal becomes reasonably foreseeable." (Pet'r's Reply at 13.) Thus, "FARRA, by its plain language, does not bar this Court's review of such claims." *Ortega*, 2025 U.S. Dist. LEXIS 152600, at *11.

### B. Likely Success on the Merits

Here, Petitioner asserts three claims: (1) that Petitioner's re-detention would violate the Due Process Clause because it would be indefinite, (2) that Petitioner's re-detention would violate the Due Process Clause absent a hearing before a neutral adjudicator, and (3) that Petitioner is entitled to constitutionally adequate procedures -- including notice and an opportunity to apply for fear-based relief -- prior to being removed to any third country. (Pet'r's Mot. at 11, 14, 24.) The Court finds that Petitioner has shown, at a minimum, that serious questions exist as to the merits of each claim.

6

### i. Removal to Third Country

The Court starts with the merits of Petitioner's assertion that he is entitled to notice and an opportunity to apply for fear-based relief prior to being removed to a third country. "The Fifth Amendment guarantees due process in deportation proceedings." *Torres-Aguilar v. I.N.S.*, 246 F.3d 1267, 1270 (9th Cir. 2001). Thus, "[a] noncitizen must be given sufficient notice of a country of deportation that, given his capacities and circumstances, he would have a reasonable opportunity to raise and pursue his claim for withholding of deportation." *Aden v. Nielsen*, 409 F. Supp. 3d 998, 1009 (W.D. Wash. 2019); *see Ortega*, 2025 U.S. Dist. LEXIS 152600, at *12.

Here, Petitioner was ordered removed to Saudi Arabia or Egypt, which are both countries to which Petitioner has no right to return. (Alvarez Decl., Exh. 1.) For that reason, Petitioner was previously released because his removal was not reasonably foreseeable. (Petition ¶ 3.) Thus, to the extent the Government now seeks to remove Petitioner to a third country *for which no final removal order exists* (such as Jordan), Petitioner would have a right to be afforded notice and an opportunity to be heard on a fear-based claim as to that country under the Fifth Amendment. *See Aden*, 409 F. Supp. 3d at 1009; *Ortega*, 2025 U.S. Dist. LEXIS 152600, at *13; *J.R. v. Bostock*, No. 2:25-cv-01161-JNW, 2025 U.S. Dist. LEXIS 124229, at *7-8 (W.D. Wash. June 30, 2025) (finding that the petitioner had "raised serious questions about the merits of his due process claim that the Government violated his rights by attempting third-country removals without providing him notice and an opportunity to seek CAT protection").

The Government does not appear to address this claim. Indeed, the Government recognizes that Petitioner could move to reopen his immigration court proceedings based on fear of removal to any third country, although it fails to explain how Petitioner could do so without getting reasonable notice of *which* third country the Government intends to deport him to. (Gov't Opp'n at 12-13.) Thus, the Court finds that Petitioner has raised a serious question as to the merits of his claim that he is entitled to notice and an opportunity to be heard before being removed to a third country.

### ii. Detention

Petitioner's first two claims concern whether his detention would violate the Due Process

7

Clause.  "The Due Process Clause applies to all 'persons' within the United States, including aliens, whether their presence here is lawful, unlawful, temporary, or permanent." *Zadvydas v. Davis*, 533 U.S. 678, 693 (2001).  "Freedom from imprisonment -- from government custody, detention, or other forms of physical restraint -- lies at the heart of the liberty that Clause protects." *Id.* at 690.  In deciding what procedures are required to protect a liberty interest, courts apply the three-part test established in *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976): (1) "the private interest that will be affected by the official action, (2) "the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards, and (3) "the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail."  *See Ortega*, 2025 U.S. Dist. LEXIS 152600, at *13-14; *Pinchi v. Noem*, No. 25-cv-5632-PC, 2025 U.S. Dist. LEXIS 142213, at *8-9 (N.D. Cal. July 24, 2025); *Guillermo M.R. v. Kaiser*, No. 25-cv-5436-RFL, 2025 U.S. Dist. LEXIS 138205, at *11 (N.D. Cal. July 17, 2025).

      Courts in this district have repeatedly found that the *Mathews* factors support Petitioner's constitutional right to a hearing before a neutral decisionmaker prior to any future detention.  With respect to the first factor, Petitioner has a substantial private interest in remaining out of custody, which "enables him to do a wide range of things open to persons" who are free from custody.  *Morrisey v. Brewer*, 408 U.S. 471, 482 (1972).  This includes remaining in his home, caring for his daughter, and supporting his wife.  *See Pinchi*, 2025 U.S. Dist. LEXIS 142213, at *9-10; *M.R.*, 2025 U.S. Dist. LEXIS 138205, at *13.  Further, Petitioner's interest in remaining out of detention is heightened by the seventeen years he has spent out of custody.  *See id.* at *12 ("The more than two years that she has spent out of custody since ICE initially released her have only heightened her liberty interest in remaining out of detention.").

      While the Government suggests that Petitioner's due process interest in his liberty "terminated when the IJ ordered his removal" (*see* Gov't Opp'n at 15), the Government provides **no** legal authority in support of this proposition, which flies in the face of the Supreme Court's recognition that "[t]he Due Process Clause applies to **all** 'persons' within the United States[.]"

8

*Zadvydas*, 533 U.S. at 693 (emphasis added). In the alternative, the Government argues that in *Diouf v. Napolitano*, the Ninth Circuit recognized that an immigrant detainee's liberty interests have a lesser liberty interest in freedom from detention. (*See* Gov't Opp'n at 16-17 (citing *Diouf*, 634 F.3d 1081, 1086-87 (9th Cir. 2011).) This finding does not suggest that individuals such as Petitioner lack any due process interest in his liberty; rather, the Ninth Circuit still recognized that "freedom from prolonged detention" was an important interest at stake. *Diouf*, 634 F.3d at 1087. Moreover, "even when ICE has the initial discretion to detain or release a noncitizen pending removal proceedings, after that individual is released from custody [he] has a protected liberty interest in remaining out of custody." *Pinchi*, 2025 U.S. Dist. LEXIS 142213, at *8; *Calderon v. Kaiser*, No. 25-cv-6695-AMO, 2025 U.S. Dist. LEXIS 163975, at *5 (N.D. Cal. Aug. 22, 2025) ("[E]ven when an initial decision to detain or release an individual is discretionary, the government's subsequent release of the individual from custody creates an implicit promise that the individual's liberty will be revoked only if they fail to abide by the conditions of their release."). Here, Petitioner was released from custody seventeen years ago, and thus has a strong interest in remaining out of custody. Accordingly, the first factor supports a pre-deprivation administrative hearing.

As to the second *Mathews* factor, there is a significant risk that the government will erroneously deprive Petitioner of his liberty interest absent a pre-detention hearing. Where "the petitioner has not received any bond or custody hearing, the risk of an erroneous deprivation of liberty is high because neither the government nor [the petitioner] has had any opportunity to determine whether there is any valid basis for her detention." *Pinchi*, 2025 U.S. Dist. LEXIS 142213, at *13 (cleaned up); *see also Calderon*, 2025 U.S. Dist. LEXIS 163975, at *9 (same). In general, "[c]ivil immigration detention is permissible only to prevent flight or protect against danger to the community." *Pinchi*, 2025 U.S. Dist. LEXIS 142213, at *13 (citing *Zadvydas*, 533 U.S. at 690). Here, the Government has made no showing that detention of Petitioner would serve either purpose, particularly after Petitioner was released seventeen years ago and has complied with ICE's reporting requirements. Indeed, it is unclear how the Government will be able to establish that Petitioner is a flight risk given his strong ties to the community (including his wife

and daughter, who are both U.S. citizens) or a danger to the community given the lack of any criminal record since his release on an OSUP. As Petitioner points out, ICE previously released him after presumably finding that he did not present a flight risk or posed a danger to the community, and the Government has identified no circumstances that have changed this determination. (*See* Petition ¶ 4.) Thus, providing "the procedural safeguard of a pre-detention hearing will have significant value in helping ensure that any future detention has a lawful basis." *Pinchi*, 2025 U.S. Dist. LEXIS 142213, at *14; *see also Ortega*, 2025 U.S. Dist. LEXIS 152600, at *14.

The Government responds that there is little risk of an erroneous deprivation because he is already subject to a removal order, and § 1231(a)(6) authorizes Petitioner's detention to execute a final removal order. (Gov't Opp'n at 17, 19.) The Supreme Court, however, has made clear that § 1231(a)(6) "does not permit indefinite detention," such that a detention cannot "exceed a period reasonably necessary to secure removal." *Zadvydas*, 533 U.S. at 690, 699. Instead, "once removal is no longer foreseeable, continued detention is no longer authorized by statute." *Id.* at 699. The Supreme Court has found that there is a presumption that the "period reasonably necessary to secure removal" is six months; after this period, "once the alien provides good reason to believe that there is no significant likelihood of removal in the reasonably foreseeable future, the Government must respond with evidence sufficient to rebut that showing." *Id.* at 701.

Here, there is a serious question regarding whether Petitioner's removal is reasonably foreseeable, such that detention would be permitted. While the Government argued at the hearing that detention is warranted to execute the final order, the Government does not dispute that Petitioner cannot be removed to the countries designated in his final removal order. Rather, "there currently exists no country to which the Government could remove [Petitioner] without his first receiving the opportunity to present a fear-based claim as to that country." *Ortega*, 2025 U.S. Dist. LEXIS 152600, at *18. Although the Government argued at the hearing that it would try to execute the final order by removing Petitioner to Jordan, Jordan is **not** a country to which Petitioner has been ordered removed. Petitioner also points out that it is not apparent that ICE has reopened removal proceedings to obtain an order removing Petitioner to a third country,

underscoring that Petitioner's removal is not likely to be reasonably foreseeable (and thus making any detention not reasonably necessary to effectuate his removal).  (Pet'r's Reply at 19.)  Notably, Petitioner has already been detained for six months previously (*see* Petition ¶ 3), such that any additional detention would likely run afoul of the six month presumption found in *Zadvydas*.

In the alternative, the Government argues that Petitioner will be adequately protected by the procedural safeguards found under 8 C.F.R. § 241.4, including periodic custody reviews in which Petitioner will have the opportunity to submit documents in support of his release.  (Gov't Opp'n at 17.)  As pointed out in *M.R.*, however, "each of those procedures is essentially no more than a request to ICE's arresting agents or their supervisors at headquarters to reconsider the agency's unilateral detention decision."  2025 U.S. Dist. LEXIS 138205, at *22.  Thus, the district court in *M.R.* found that "there is no opportunity to have a neutral party evaluate ICE's unilateral determination of the contested facts," and that this "lack of any neutral review creates a heightened risk of deprivation for Petitioner."  *Id.* at *23.  The Court finds that the second *Mathews* factor supports a pre-deprivation hearing.

Finally, "there is no countervailing government interest -- the third and final *Mathews* factor -- that supports conducting a bond hearing only after [Petitioner] has been detained, rather than in advance thereof."  *Pinchi*, 2025 U.S. Dist. LEXIS 142213, at *15.  The Government suggests that a hearing would delay executing of his final order of removal, but there is no showing that the Government can remove Petitioner to the countries listed in his final order of removal.  (Gov't Opp'n at 17.)  Further, contrary to the Government's protestations that there is no process for giving aliens with final orders of removal a bond hearing, the Government does not explain why this would be an "unworkable solution."  (Gov't Opp'n at 17-18.)  Rather, courts in this district have already rejected similar arguments, finding that the Government could not "suggest that the cost of providing [a hearing before a neutral decisionmaker] would be fiscally or administratively onerous."  *Pinchi*, 2025 U.S. Dist. LEXIS 142213, at *17.  Such courts have found that "[i]n immigration court, custody hearings are routine and impose a minimal cost.  Indeed, it is likely that the cost to the government of detaining [Petitioner] pending any bond hearing would significantly exceed the cost of providing h[im] with a pre-detention hearing."  *Id.*

11

(internal quotation omitted); *see also Hernandez v. Sessions*, 872 F.3d 976, 996 (9th Cir. 2017) ("The costs to the public of immigration detention are 'staggering': $158 each day per detainee, amounting to a total daily cost of $6.5 million.").

Accordingly, each of the *Mathews* factors favor Petitioner. Petitioner has thus demonstrated a serious question exists as to the merit of his claims.

### C. Irreparable Harm

As many other courts in this district have found, the Court finds that Petitioner is likely to suffer irreparable harm in the absence of a preliminary injunction -- namely, detention in likely violation of his constitutional rights. "'It is well established that the deprivation of constitutional rights unquestionably constitutes irreparable injury.'" *Ortega*, 2025 U.S. Dist. LEXIS 152600, at *18 (quoting *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012)). Further, the Ninth Circuit has recognized "the irreparable harms imposed on anyone subject to immigration detention (or other forms of imprisonment), including "subpar medical and psychiatric care in ICE detention facilities, the economic burdens imposed on detainees and their families as a result of detention, and the collateral harms to children of detainees whose parents are detained." *Hernandez*, 872 F.3d at 995. Such risks are present here because detention would separate Petitioner from his family, including his daughter who is uniquely dependent on Petitioner for support. (Petition ¶ 5.)

In opposition, the Government argues that detention would not cause irreparable harm because "there is no constitutional infringement if restrictions imposed are but an incident of some other legitimate government purpose." (Gov't Opp'n at 19 (internal quotation omitted).) As discussed above, however, there is a serious risk that detention without the required procedures would constitute a constitutional violation. Thus, Petitioner has established irreparable harm. *See Pinchi*, 2025 U.S. Dist. LEXIS 142213, at *18-19; *Calderon*, 2025 U.S. Dist. LEXIS 163975, at *11; *M.R.*, 2025 U.S. Dist. LEXIS 138205, at *31-32.

### iii. Balance of Equities and the Public Interest

The final two factors -- the balance of equities and the public interest -- "merge where, as is the case here, the government is the opposing party." *Leiva-Perez v. Holder*, 640 F.3d 962, 970 (9th Cir. 2011). Again, as many courts in this district have found, these two factors "tip sharply"

in Petitioner's favor. *Ortega*, 2025 U.S. Dist. LEXIS 152600, at *20.

"The public has a strong interest in upholding procedural protections against unlawful detention, and the Ninth Circuit has recognized that the costs to the public of immigration detention are staggering." *Diaz v. Kaiser*, No. 25-cv-5071-BLF, 2025 U.S. Dist. LEXIS 113566, at *8 (N.D. Cal. June 14, 2025) (internal quotation omitted); *see also Ortega*, 2025 U.S. Dist. LEXIS 152600, at *20 (same); *Pinchi*, 2025 U.S. Dist. LEXIS 142213, at *20 (same); *M.R.*, 2025 U.S. Dist. LEXIS 138205, at *32-33 ("The public has an interest in the orderly and efficient administration of this country's immigration laws, but also has a strong interest in upholding procedural protections against unlawful detention. . . . Further, the general public's interest in the efficient allocation of the government's fiscal resources is served by avoiding the cost of potential erroneous detention."); *Calderon*, 2025 U.S. Dist. LEXIS 163975, at *12 (finding that the balance of hardships favored the petitioner where "[a]t most, the Government's injury would be a short delay in detaining Ortiz Calderson, and despite its contention that it has a compelling interest in the steady enforcement of its immigration laws, it cannot reasonably assert that it is harmed in any legally cognizable sense by being enjoined from constitutional violations").

"Faced with a choice between minimally costly procedures and preventable human suffering, the Court concludes that the balance of hardships tips decidedly in [P]etitioner's favor." *Clavijo v. Kaiser*, No. 25-cv-6248-BLF, 2025 U.S. Dist. LEXIS 163056, at *25 (N.D. Cal. Aug. 21, 2025) (internal quotations omitted).

### D. Security

Federal Rule of Civil Procedure 65(c) provides that "[t]he court may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." The Court has "discretion as to the amount of security required, *if any*," and "may dispense with the filing of bond when it concludes there is no realistic likelihood of harm to the defendant from enjoining his or her conduct." *Jorgensen v. Cassiday*, 320 F.3d 906, 919 (9th Cir. 2003). The Government has made no argument that security should be required, and courts in this district have repeatedly found that "there is no realistic likelihood of

13

harm to the Government from enjoining its conduct" in cases similar to the instant one. *Calderon*, 2025 U.S. Dist. LEXIS 163975, at *13; *see also Ortega*, 2025 U.S. Dist. LEXIS 152600, at *21; *Clavijo*, 2025 U.S. Dist. LEXIS 163056, at *26; *M.R.*, 2025 U.S. Dist. LEXIS 138205, at *33. Thus, the Court will not require a security bond.

## IV. CONCLUSION

For the reasons stated above, the Court GRANTS Petitioner's motion for a preliminary injunction. During the pendency of these proceedings, Respondents-Defendants are enjoined and restrained from detaining Petitioner unless he is afforded notice and a hearing before an immigration judge, and prohibited from removing Petitioner to a third country without first providing him with constitutionally compliant notice and an opportunity to apply for fear-based relief prior to being removed to a third country.

IT IS SO ORDERED.

Dated: October 10, 2025

_____
KANDIS A. WESTMORE
United States Magistrate Judge